Peter F. Lindborg, Esq. (SBN 150192)
Irina J. Mazor, Esq. (SBN 185144)
Patricia I. Forman, Esq. (SBN 245108)
LINDBORG & MAZOR LLP
550 North Brand Boulevard, Suite 1830
Glendale, California 91203
Tel: 818/637-8325
Fax: 818/637-8376

Attorneys for Defendant,
GLOBAL TECH SYSTEMS, INC.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BECO DAIRY AUTOMATION, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GLOBAL TECH SYSTEMS, INC. and DOES 1 to 50,<br><br>Defendants. | CASE NO.: 1:12-cv-1310-LJO-S-MS<br>*Hon. Lawrence J. O'Neill*<br><br>**GLOBAL TECH SYSTEMS, INC.'S ANSWER TO BECO DAIRY AUTOMATION, INC.'S COMPLAINT AND COUNTERCLAIM FOR:<br>1. DECLARATORY JUDGMENT;<br>2. BREACH OF CONTRACT;<br>3. INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; AND<br>4. MISAPPROPRIATION OF INTELLECTUAL PROPERTY** |

Defendant, GLOBAL TECH SYSTEMS, INC. (hereinafter "Defendant" or "GTS") hereby

respectfully submits its Answer to Plaintiff Beco Dairy Automation System, Inc.'s (hereinafter

"Plaintiff" or "BECO") First Amended Complaint ("FAC") and its Counterclaim for Declaratory

Judgment, Breach of Contract, Interference with Prospective Economic Advantage, and

Misappropriation of Intellectual Property as follows:

ANSWER AND COUNTERCLAIM OF GLOBAL TECH SYSTEMS, INC.

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL 818 637-8325

## ANSWER

1. Defendant admits the allegations of paragraph 1 of the FAC.

2. Defendant admits those portions of paragraph 2 of the FAC that allege it is a New Mexico Corporation headquartered in Rio Rancho, New Mexico.  Defendant denies all remaining allegations of paragraph 2 of the FAC.

3. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 3 through 17 of the FAC and therefore, denies the same.

4. GTS admits the allegations of paragraph 18 of the FAC.

5. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 19 through 33 of the FAC and therefore, denies the same.

6. GTS denies the allegations of paragraphs 34 through 36 of the FAC.

7. GTS admits the allegations of paragraph 37 of the FAC.

8. GTS denies the allegations of paragraphs 38 and 39 of the FAC.

9. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 40 through 53 of the FAC and therefore, denies the same.

10. In response to paragraph 54 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

11. Defendant admits that portion of paragraph 55 of the FAC that alleges that on or about May 5, 2005, Plaintiff and Defendant entered into a written agreement.  Defendant denies all remaining allegations of paragraph 55 of the FAC.

12. GTS denies the allegations of paragraphs 56 through 58 of the FAC.

13. Defendant admits that portion of paragraph 59 of the FAC that alleges that it corresponded with Plaintiff on or about March 4, 2010. Defendant denies all remaining allegations of paragraph 59 of the FAC.

14. GTS denies the allegations of paragraph 60 of the FAC.

15. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 61 of the FAC and therefore, denies the same.

16. GTS denies the allegations of paragraphs 62 and 63 of the FAC.

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

ANSWER AND COUNTERCLAIM OF GLOBAL TECH SYSTEMS, INC.

17. In response to paragraph 64 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

18. GTS denies the allegations of paragraphs 65 and 66 of the FAC.

19. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 67 of the FAC and therefore, denies the same.

20. GTS denies the allegations of paragraph 68 of the FAC.

21. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 69 through 71 of the FAC and therefore, denies the same.

22. GTS denies the allegations of paragraphs 72 and 73 of the FAC.

23. In response to paragraph 74 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

24. Defendant admits that portion of paragraph 75 of the FAC that alleges that on or about May 5, 2005, Plaintiff and Defendant entered into an agreement. Defendant denies all remaining allegations of paragraph 75 of the FAC.

25. GTS denies the allegations of paragraphs 76 through 81 of the FAC.

26. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 82 and 83 of the FAC and therefore, denies the same.

27. GTS denies the allegations of paragraph 84 of the FAC.

28. In response to paragraph 85 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

29. GTS denies the allegations of paragraphs 86 through 94 of the FAC.

30. In response to paragraph 95 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

31. GTS denies the allegations of paragraphs 96 through 98 of the FAC.

32. In response to paragraph 99 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

33. GTS denies the allegations of paragraphs 100 through 105 of the FAC.

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

-3-

34. In response to paragraph 106 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

35. GTS denies the allegations of paragraphs 107 through 111 of the FAC.

36. In response to paragraph 112 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

37. GTS denies the allegations of paragraphs 113 through 123 of the FAC.

38. In response to paragraph 124 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

39. GTS denies the allegations of paragraphs 125 through 132 of the FAC.

40. In response to paragraphs 133 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

41. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 134 of the FAC and therefore, denies the same.

42. GTS denies the allegations of paragraph 135 of the FAC.

43. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 136 of the FAC and therefore, denies the same.

44. GTS denies the allegations of paragraphs 137 through 144 of the FAC.

45. In response to paragraphs 145 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

46. Defendant admits that portion of paragraph 146 of the FAC that alleges that on or about May 5, 2005, Plaintiff and Defendant entered into an agreement. Defendant denies all remaining allegations of paragraph 146 of the FAC.

47. GTS denies the allegations of paragraph 147 of the FAC.

48. Defendant admits those portions of paragraph 148 of the FAC that allege a controversy exists between Plaintiff and Defendant. Defendant denies all remaining allegations of paragraph 148 of the FAC.

49. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 149 and 150 of the FAC and therefore, denies the same.

-4-

ANSWER AND COUNTERCLAIM OF GLOBAL TECH SYSTEMS, INC.

LINDEBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

50. GTS denies the allegations of paragraph 151 of the FAC.

51. In response to paragraph 152 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

52. GTS denies the allegations of paragraphs 153 through 155 of the FAC.

53. Defendant admits that portion of paragraph 156 of the FAC that alleges that a controversy exists between Plaintiff and Defendant. Defendant denies all remaining allegations of paragraph 156 of the FAC.

54. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 157 and 158 of the FAC and therefore, denies the same.

55. GTS denies the allegations of paragraph 159 of the FAC.

56. In response to paragraph 160 of the FAC, GTS incorporates the preceding paragraphs of its answer as if fully set forth herein.

57. GTS denies the allegations of paragraphs 161 through 163 of the FAC.

58. Defendant admits that portion of paragraph 164 of the FAC that alleges that a controversy exists between Plaintiff and Defendant. Defendant denies all remaining allegations of paragraph 164 of the FAC.

59. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 165 and 166 of the FAC and therefore, denies the same.

60. GTS denies the allegations of paragraph 167 of the FAC.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

(Accord and Satisfaction)

That BECO is barred and precluded from recovery in this action by virtue of the doctrine of accord and satisfaction.

LANDSBERG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

-5-

**SECOND AFFIRMATIVE DEFENSE**

(Assumption of Risk)

That BECO is barred and precluded from recovery in this action due to the fact that BECO assumed the risk that any alleged business venture might fail, was cognizant of said possibility, and assumed the risk of the same.

**THIRD AFFIRMATIVE DEFENSE**

(Contribution)

That the incidents described in the FAC and any damages allegedly sustained by BECO were wholly or partially contributed to and proximately caused by BECO's own acts, omissions and activities, including and resulting in carelessness, recklessness, and/or negligence by BECO, thereby completely or partially barring recovery herein.

**FOURTH AFFIRMATIVE DEFENSE**

(Estoppel)

That BECO's claims are barred or diminished under the doctrine of estoppel.

**FIFTH AFFIRMATIVE DEFENSE**

(Failure of Consideration, Waiver, Breach of Condition Precedent)

That if any contracts, obligations or agreements as alleged in the FAC have been entered into, any duty or performance of GLOBAL TECH is excused by reason of failure of consideration, waiver, breach of condition precedent, breach by BECO, impossibility of performance, prevention by BECO, frustration of purpose and/or acceptance by BECO.

**SIXTH AFFIRMATIVE DEFENSE**

(Laches)

That BECO's claims are barred or diminished under the doctrine of laches.

**SEVENTH AFFIRMATIVE DEFENSE**

(License)

That BECO's claims are barred by its license, consent, and acquiescence to GLOBAL TECH's actions.

LANDESMAN & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

-6-

**EIGHTH AFFIRMATIVE DEFENSE**

(Failure to State a Claim)

That the FAC, and each individual claim therein, fails to state a claim upon which relief can be granted to BECO.

**NINTH AFFIRMATIVE DEFENSE**

(Release)

That BECO's claims are barred or diminished under the doctrine of release or discharge of contractual obligation.

**TENTH AFFIRMATIVE DEFENSE**

(Statute of Frauds)

That any and all agreements alleged in the First Amended Complaint are violative of the Statute of Frauds.

**ELEVENTH AFFIRMATIVE DEFENSE**

(Statute of Limitations)

That BECO's claims are barred by the relevant Statute of Limitations.

**TWELFTH AFFIRMATIVE DEFENSE**

(Waiver)

That BECO's claims are barred or diminished under the doctrine of waiver.

**THIRTEENTH AFFIRMATIVE DEFENSE**

(Unclean Hands)

That any recovery on the FAC or any purported cause of action alleged therein is barred or reduced under the doctrine of unclean hands.

**FOURTEENTH AFFIRMATIVE DEFENSE**

(Mitigation)

That at all times mentioned herein, BECO failed to use reasonable care to reduce and mitigate, as much as reasonably possible, its damages, if any, and that this failure is the direct and proximate cause of any and all damages, if any, sustained by BECO.

ANSWER AND COUNTERCLAIM OF GLOBAL TECH SYSTEMS, INC.

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL: 818 637-8325

**FIFTEENTH AFFIRMATIVE DEFENSE**

(Reservation of Right to Amend Answers)

GLOBAL TECH hereby gives notice that it intends to rely on such other and further affirmative defenses as may become available during discovery in this action and reserves the right to amend its answer to assert any such defenses.

WHEREFORE, Defendant GLOBAL TECH prays as follows in relation to its Answer:

1. That Plaintiff BECO take nothing by reason of the FAC and that judgment be rendered in favor of GTS;

2. That Defendant be awarded its costs of suit incurred in defense of this action; and

3. For such other relief as the Court deems proper.

**COUNTERCLAIM**

**STATEMENT OF FACTS**

1. GLOBAL TECH SYSTEMS, INC. ("GLOBAL TECH") is a New Mexico corporation doing business in the State of New Mexico, with its principal office located in the City of Rio Rancho.

2. BECO DAIRY AUTOMATION, INC. ("BECO") is a California Corporation, with its principal office located in the City of Hanford, California.

3. GLOBAL TECH is the owner of certain intellectual property employed in the dairy industry to measure and monitor the milk production of dairy cows on a commercial basis. The intellectual property owned by GLOBAL TECH includes, but is not limited to, products now known as the Scan Nexus electronic milk meter, FlowNexus detacher electronics, PulsNexus pulsation monitor system, and Parlor Scan Software. The intellectual property owned by GLOBAL TECH is protected by various patents issued by the United States Patent and Trademark Office. The patents are owned by GLOBAL TECH. The trade names are not owned by GLOBAL TECH, but are used by BECO to market and sell the products.

ANSWER AND COUNTERCLAIM OF GLOBAL TECH SYSTEMS, INC.

### Formation and Cancellation of the Distribution Agreement

4. In April of 2005, GLOBAL TECH entered into a distribution agreement with BECO, which granted BECO the exclusive right to market the ScanNexus electronic milk meter, Flow Nexus detacher electronics, the PulsNexus pulsation monitor system, and the ParlorScan Software ("the Contracted Products"), in the continental United States, Canada, Saudi Arabia and Japan. The rights granted under the distribution agreement were limited to the technology as it existed as of the date of the contract, and did not include any products developed in the future, or technological improvements made to the Contracted Products. A copy of the distribution agreement is attached hereto as Exhibit 1 (hereinafter "the Distribution Agreement").

5. The Distribution Agreement contemplates that it will terminate at the end of 2007, and a new agreement will be negotiated with respect to future distribution rights.

6. Notwithstanding that GLOBAL TECH requested a new distribution agreement, and attempted to negotiate a new distribution agreement, BECO failed and refused to negotiate such new agreement in good faith.

7. During the time it was attempting to negotiate a new agreement with BECO, GLOBAL TECH permitted BECO to continue to distribute the Contracted Products under the general terms of the Distribution Agreement.

8. Pursuant to the Distribution Agreement, BECO agreed to sell not less than 206 units of Contracted Products in combination per month, increasing to 250 units per month in 2006, and finally 350 units per month in 2007.

9. During the term of the contract BECO failed to achieve the minimum sales levels required by the contract.

10. GLOBAL TECH gave BECO notice and the opportunity to cure its breach of contract on numerous occasions. BECO failed to achieve the minimum sales levels and remained in breach of its contract.

11. On or about March 4, 2010 GLOBAL TECH notified BECO that the Distribution Agreement was cancelled due to BECO's failure and refusal to negotiate and enter into a new distribution agreement after the end of the term of the Distribution Agreement.

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

ANSWER AND COUNTERCLAIM OF GLOBAL TECH SYSTEMS, INC.

**Formation and Performance of Cow ID Contract**

12. Also in April of 2005, the parties entered into a separate system development contract for the development of a basic Cow ID system which could be used in conjunction with the Contracted Products. A copy of this agreement is attached hereto as Exhibit 2 (hereinafter, the "Cow ID Contract").

13. Pursuant to the Cow ID Contract, Global Tech was to develop certain specified modules forming a basic Cow ID system in exchange for the compensation stated in the Cow ID Contract. Any additional or new features added to the system were to be separately charged for by GLOBAL TECH and paid for by BECO.

14. GLOBAL TECH did, in fact, develop the basic system required by the Cow ID Contract and then, at the request of BECO, proceeded to develop additional or new features related to the basic system, for which GLOBAL TECH thereafter invoiced BECO.

**Conduct of Beco Since the Cancellation of Distribution Agreement**

15. BECO failed and refused to acknowledge that its right to serve as the exclusive marketing agent for the Contracted Products within the designated geographical area was terminated. BECO responded to said termination by wrongfully making demands for new products and services not contemplated by any agreement and commencing this litigation.

16. Although BECO's exclusive right to sell the Contracted Products in the designated geographic area has been terminated, BECO nevertheless continues to hold itself out to the public as the exclusive marketing agent for GLOBAL TECH and the Contracted Products. BECO has interfered with GLOBAL TECH's sale of the Contracted Products and has interfered and prevented GLOBAL TECH from securing new distribution agreements with other sales agents.

17. BECO, through its President Stan Brown, between June 2001 (the date of GLOBAL TECH's incorporation) and the present, has also misrepresented the capabilities and capacity of the Contracted Products, and has falsely represented to actual and potential customers located both within and without the authorized distribution area of BECO that GLOBAL TECH would deliver the Contracted Products and other products not covered by the Distribution Agreement with the capacity to perform tasks, collect and report data, and otherwise perform functions that are not

-10-

ANSWER AND COUNTERCLAIM OF GLOBAL TECH SYSTEMS, INC.

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

within the specifications of the Contracted Products (or any other product marketed by GLOBAL TECH). It is impossible for GLOBAL TECH to know at this time the identities of each and every individual or entity to which this representation was made.

18. BECO, through its President Stan Brown, has falsely represented that GLOBAL TECH would develop and support certain new products and provide support services that were not contemplated by the Distribution Agreement. It is impossible for GLOBAL TECH to know at this time the identities of each and every individual or entity to which this representation was made.

19. GLOBAL TECH herein alleges upon information and belief that BECO, through its President, Stan Brown, has falsely represented to actual and potential customers and suppliers of GLOBAL TECH, and to the public at large, that it has rights under an alleged oral contract to act as an agent or representative of GLOBAL TECH with respect to its products or services. It is impossible for GLOBAL TECH to know at this time the identities of each and every individual or entity to which this representation was made.

20. GLOBAL TECH has not entered into any contract or agreement with BECO (other than the expired Distribution Agreement) that would authorize BECO to act as GLOBAL TECH's representative or agent, with respect to GLOBAL TECH's products or services.

21. BECO's unauthorized representations and interferences have caused GLOBAL TECH damage, including lost sales, lost profit, and impairment of GLOBAL TECH's goodwill and reputation, in an amount to be determined at trial.

22. GLOBAL TECH has recently discovered that BECO sold and delivered some or all of the Contracted Products to a dairy located in the Ukraine, which is outside of the geographic areas designated in the Distribution Agreement. The products were sold and delivered without GLOBAL TECH's prior knowledge or approval, and contrary to GLOBAL TECH's express instructions.

23. By delivering the Contracted Products outside of the geographic area previously authorized by the Distribution Agreement, contrary to the express instructions and directions of GLOBAL TECH, BECO has endangered GLOBAL TECH's intellectual property. GLOBAL TECH may be forced

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

-11-

1    to incur unanticipated expense to protect its intellectual property in countries where its patents

2    have not yet been recognized.

3    24. Additionally, BECO has improperly and surreptitiously attempted to acquire GLOBAL TECH's

4    intellectual property and trade secrets by attempting to interfere with GLOBAL TECH's

5    relationships with its employees including, but not limited to, GLOBAL TECH's software

6    engineer, Jorge Mireles.

**FIRST CLAIM FOR DECLARATORY JUDGMENT [28 USC § 2201]**

8    25. GLOBAL TECH incorporates and realleges each and every allegation above as though fully set

9    forth herein.

10   26. Pursuant to 28 USC § 2201, a real and substantial controversy admitting of specific relief through

11   a decree of conclusive character now exists as between GLOBAL TECH and BECO in relation to

12   GLOBAL TECH's rights, status and other legal relations arising from the Distribution Agreement

13   and its dealings with BECO.

14   27. GLOBAL TECH is entitled to a judgment declaring that the Distribution Agreement is null and

15   void and of no further effect as of January 1, 2008, but in no case later than March 4, 2010, and

16   further declaring that BECO has no right to act as the exclusive marketing agent for GLOBAL

17   TECH with respect to the Contracted Products, or any other Global Tech products or services.

18   28. GLOBAL TECH is entitled to a judgment declaring it has no obligation to sell its products or

19   services through BECO, or otherwise have any contractual relations with BECO arising from the

20   Distribution Agreement, or any alleged oral contract or agreement.

**SECOND CLAIM FOR BREACH OF CONTRACT**

**(Development Agreement)**

23   29. GLOBAL TECH incorporates and realleges each and every allegation above as though fully set

24   forth herein.

25   30. BECO breached the Distribution Agreement with GLOBAL TECH by failing to sell the minimum

26   quantities of the Contracted Products specified in the Distribution Agreement, by selling the

27   Contracted Products outside of the authorized geographic area, by misrepresenting its authority

28   under the Distribution Agreement, and by misinforming actual and potential customers, suppliers,

-12-

ANSWER AND COUNTERCLAIM OF GLOBAL TECH SYSTEMS, INC.

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

and the public at large that BECO continues to act as GLOBAL TECH's exclusive marketing agent.

31. GLOBAL TECH performed each and every obligation required of it under the Distribution Agreement, except those of which GLOBAL TECH was prevented from performing by the actions or inactions of BECO, or those of which were excused or waived by BECO.

32. BECO's actions have damaged GLOBAL TECH in an amount to be proven at trial, including, but not limited to: lost sales, lost profit, and impairment of GLOBAL TECH's goodwill and reputation.

### THIRD CLAIM FOR BREACH OF CONTRACT

### (Cow ID Contract)

33. GLOBAL TECH incorporates and realleges each and every allegation above as though fully set forth herein.

34. BECO breached the Cow ID Contract by failing to compensate GLOBAL TECH for the new or additional features developed for the system by GLOBAL TECH at the request of BECO.

35. GLOBAL TECH performed each and every obligation required of it under the Cow ID Contract, except those of which GLOBAL TECH was prevented from performing by the actions or inactions of BECO, or those of which were excused or waived by BECO.

36. BECO's actions have damaged GLOBAL TECH in an amount to be proven at trial.

### FOURTH CLAIM FOR INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

37. GLOBAL TECH incorporates and realleges each and every allegation above as though fully set forth herein.

38. GLOBAL TECH has the ability to contract with new marketing representatives and other industry vendors and/or wholesalers, wherein GLOBAL TECH would derive future profits.

39. BECO had knowledge of the fact that GLOBAL TECH was continuing to work toward increasing its customer base and the use of its products in the agricultural industry.

40. BECO's false representations and unauthorized actions, including the actions identified above, have wrongfully and unlawfully interfered with GLOBAL TECH's ability to contract with new

-13-

ANSWER AND COUNTERCLAIM OF GLOBAL TECH SYSTEMS, INC.

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

marketing representatives, have interfered with both actual and potential sales contracts, and have wrongfully and unlawfully interfered with GLOBAL TECH's ability to market and sell new products and services.

41. BECO's misrepresentations through its President Stan Brown about the capacity and capabilities of GLOBAL TECH's products, including the Contracted Products, and GLOBAL TECH's services, have damaged GLOBAL TECH's relations with its existing customers and damaged GLOBAL TECH's industry reputation.

42. GLOBAL TECH has suffered damage which has been directly and proximately caused by BECO's actions, including lost profit, lost sales, lost contract opportunities, and damages to GLOBAL TECH's reputation and goodwill.

**FIFTH CLAIM FOR MISAPPROPRIATION OF INTELLECTUAL PROPERTY**

43. GLOBAL TECH incorporates and realleges each and every allegation above as though fully set forth herein.

44. BECO's unauthorized sale and disclosure of GLOBAL TECH's intellectual property by sale of GLOBAL TECH products to end users in the Ukraine and other unauthorized geographical areas violated GLOBAL TECH's patent rights and its right to protect its trade secrets.

45. BECO continues to attempt the unauthorized sale and disclosure of GLOBAL TECH's intellectual property by soliciting end users in unauthorized geographical areas, which threatens to further impair GLOBAL TECH's ability to protect its patent rights and trade secrets.

46. The ScanNexus, FlowNexus, PulsNexus and ParlorScan are all trade names given to the product by BECO. Those trade names are the property of BECO, but the related patents, which are the property of GLOBAL TECH, are identified as follows:

    a.  Method for measuring flow rates of a continuous fluid flow: Patent #6604053 issued 08/05/2003;

    b.  Milk flow meter for a milking system having a substantially stable vacuum leval and method for using same, Patent #6722208 issued 04/20/2004;

    c.  Milk flow meter for a milking system having a substantially stable vacuum level and method for using same, Patent #6799474 issued 10/05/2004;

-14-

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

    d.  Controller for monitoring and controlling a designated pulsator in a milking system and method of using same, Patent #6990924 issued 01/31/06;

    e.  Pulsator controller for monitoring and controlling a designated pulsator in a milking system and method for using same, Patent #7051673 issued 05/30/2006;

    f.  Milk flow meter for a milking system having a substantially stable vacuum level and method for using same, Patent #7063043 issued 06/20/2006;

    g.  Controller for monitoring and controlling pulsators in a milking system, Patent #7174848 issued 02/13/2007;

    h.  Controller for monitoring and controlling pulsators in a milking system, Patent #7841296 issued 11/30/2010.

47. BECO's actions as described above entitle GLOBAL TECH to damages pursuant to 35 USC 284 and attorneys' fees and costs pursuant to 35 USC 285.

48. Pursuant to 35 USC 283, GLOBAL TECH is entitled to an injunction permanently restraining and enjoining BECO from selling or attempting to sell products or services of GLOBAL TECH or disclosing its trade secrets, or otherwise making unauthorized and unlawful disclosure of GLOBAL TECH's intellectual property as outlined above.

49. BECO's actions have been malicious, intentional, unlawful and in bad faith.

## PRAYER

WHEREFORE, GLOBAL TECH prays as follows in relation to its Counterclaims:

1. That GLOBAL TECH be granted an award of compensatory damages according to proof at trial, plus pre- and post-judgment interest thereon;

2. That the Court enter an award of punitive damages against BECO and in favor of GLOBAL TECH;

3. That GLOBAL TECH be awarded its attorneys' fees and costs;

4. That the Court enter an injunction permanently restraining and enjoining BECO from selling or attempting to sell products or services of GLOBAL TECH;

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

-15-

5. That the Court enter an injunction permanently restraining and enjoining BECO from making unauthorized and unlawful disclosures of, or attempts to improperly acquire, GLOBAL TECH's intellectual property;

6. For such other relief as the Court deems proper.

Dated this ⁊⁊ day of October, 2012.

LINDBORG & MAZOR LLP

By: _____
PETER F. LINDBORG, Esq.
Attorneys for Defendant, Global Tech
Systems, Inc.

LINDBORG & MAZOR LLP
550 NORTH BRAND BOULEVARD, SUITE 1830
GLENDALE, CALIFORNIA 91203
TEL. 818 637-8325

-16-

ANSWER AND COUNTERCLAIM OF GLOBAL TECH SYSTEMS, INC.

# EXHIBIT 1

## Agreement between BECO Dairy Automation Inc., a California corporation and Global Tech Systems Inc. a New Mexico corporation.

### Recitals

In approximately 1998, Global Tech Systems (GTS) was formed with the expectation that it could develop some unique products for the dairy industry and build its business accordingly. Having a close relationship with BECO meant that there was support in the form of financial assistance, knowledge of the industry as well as a marketing outlet for the products to be developed. BECO on the other hand desired to upgrade its aging product line and was willing to partner with GTS in these developments with the understanding that it would benefit through having new products to sell exclusively in North America. The two companies moved forward together with this basic need of each other.

During the development process, GTS supplied engineering expertise as well as financial resources, and BECO supplied product definition and financial resources. As products were developed both companies worked together to test these concepts, performed field trials, and evaluated improvements and enhancements to the products.

As products became available for sale it was agreed that that GTS would be the supplier of the core components to BECO, BECO would do the final assembly and BECO would be the exclusive seller of the products.

It is now the desire of both companies to have a written agreement that spells out the future relationship with each other. BECO requires its ongoing exclusivity to the products it helped develop as well as get repaid for money it has invested in GTS. GTS desires to have BECO sell enough products as to get GTS stockholders a return on their investment and repay monies borrowed from BECO. Because BECO is the only customer of GTS at this time, GTS must rely on BECO for the sales revenue needed to satisfy both parties' desires.

Due to the nature of this relationship, BECO needs to do all it can to grow sales volume to generate the revenue required to meet the needs mentioned. Likewise, GTS needs to pursue additional customers of its choosing in areas outside of North America to help in the matter as well.

## Minimum purchases from BECO to GTS

It has been defined that the minimum level of purchases of product by BECO from GTS is $32,960 or 206 units per month. Any amount less that this causes GTS to loose.

## Burden of maintaining a minimum purchase amount

The following procedure will be implemented with regard to the minimum purchase level. See exhibit "B" Repayment Intentions. A 250-combined unit plan will hold until the end of fiscal 2006. In 2007, the combined amount is increased to 350 pieces per month.

The implementation of COW ID based on the agreement time line between Antonio Fematt and BECO and is to conclude on September 30th 2005. In the event that this time line is elongated the conditions for increase in unit count (350) for 2007 will have to be re-negotiated as discussed at the directors meeting in Hanford May 4th 2005.

## Money owed to BECO from GTS

At the time of this agreement, GTS owes BECO $266,270.96 An accounting of this amount is attached as exhibit, "A" which is agreed and signed by both parties. This dollar amount is to be frozen once this agreement is signed. No addition amount will be accrued. This reimbursement plan is based on the formula on exhibit "B".

As additional consideration for ongoing exclusivity, BECO will not charge GTS interest on this loan.

## Reimbursement of money loaned to GTS from BECO

As additional consideration for ongoing exclusivity, BECO will carry the burden on how fast this money gets paid back. GTS will reimburse BECO for monies it owes based on exhibit "B". This repayment plan is based on the number of units purchased by BECO from GTS and per the formula on exhibit "B".

## Ongoing Exclusivity

GTS grants BECO the ongoing exclusive marketing rights to the products defined herein in the geographical areas of Continental US, Canada, Saudi Arabia, and Japan.

GTS retains the right to develop other products that are non competitive to those developed with BECO for other companies and also retains the right to sell the products it developed with BECO in other markets not exclusive to BECO after a renegotiated agreement in the spring of 2007.

<u>Definition of the products in exclusive agreement</u>
(1) ScanNexus electronic milk meter
(2) FlowNexus detacher electronics
(3) PulsNexus pulsation monitoring System
(4) ParlorScan software consisting of management systems used in the PulsNexus, FlowNexus, ScanNexus and auto ID.

(Products are defined to be as they are being marketed at the date of this agreement)

The development of future incidental products such as cow I.D. and herd management software are not defined and not in the scope of this agreement.

[Note: the Nexus name is a trademark exclusively of BECO]

<u>Patents</u>
GTS has obtained, and may obtain more, patent coverage on products it developed with BECO assistance. Because these patents are US only patents at this time, and BECO is the exclusive distributor of the product, the companies agree to decide jointly if any action will be taken on companies that infringe on the patents. Likewise the two companies agree to share the expense and royalty, if any, on any patent litigation.

<u>Support GTS will give to BECO</u>
GTS agrees to fully train BECO personnel on the installation, adjustments and use of the products it develops. GTS agrees to offer technical phone support to BECO when questions arise. If GTS is asked to go on sight to help with a problem not related to the design or function of the equipment than BECO agrees to compensate GTS for that expense.

<u>Development completion</u>
GTS agrees to complete any unfinished development for current projects. This includes:
    (1) Achieving milk meter accuracy judged by the following:
        a. 3% difference (plus or minus) comparing meters to bulk tank.
        b. 5% difference (plus or minus) comparing meters to one another.
        c. Objectives to be judged after at least 200 milkings per meter
    (2) Complete milk meter calibration procedures required to achieve #1
    (3) Document meter accuracy for prospective buyers
    (4) Determining if the meter will pass ICAR or the new DHIA approvals.

<u>Warranty.</u>
Global Tech warrants to BECO that it will repair or replace any products that fail within one year after installation if the product failed for reasons of defective

design or electronic manufacturing. BECO will be responsible for all warranty as it relates to final assembly manufacturing defects within the warranty period. BECO must test and approve any device (hardware or software) before installation.

**Liability**
Both parties accept their own liability in the sale of the product to their customers.

**Other**
This agreement is ongoing and not transferable to other parties without written consent of the other party.

**Property rights**
GTS owns all rights (patents, intellectual property, etc.) for all products in this agreement, BECO can't reproduce, copy or distribute any hardware or software involved for all products without explicit GTS authorization.
BECO can't sell devices that are directly competitive with the ones described in this agreement.

Agreed by the following principals of each company

BECO Dairy Automation Inc.

- Ray Vasquez (operations director) ____________
- Bob Borchert (sales director) ____________
- Stan Brown (president) ____________
- Brad Losching (executive officer) ____________

GTS Global Tech Systems Inc.

- Antonio Fematt (president) ____________
- Stan Brown (stockholder) ____________
- Bob Borchert (stockholder) ____________
- Victor Viesca (stockholder) ____________

# REPAYMENT INTENTIONS

BECO has advanced monies to Antonio Fematt for housing, and contract labor during his stay in CA. GTS plans to increase the monthly payments on the following basic:

In May, June and July of 2005 on the 15th day of each month GTS will pay BECO $10,000.00. The commitment can be initiated because BECO has contracted Antonio Fematt to do the software interface and will pay all of his expenses for those months.

After July of 05, GTS will repay BECO at a rate based on monthly purchases from GTS. The schedule is as follows:

| Purchases from GTS after July 05 | Proposed monthly payments to BECO | |
|---|---|---|
| 250 devices — 40K | $ 5,000.00 = $ 20.00 | PER PIECE / BOARD |
| 300 devices 48K | $ 8,000.00 = $ 26.66 | |
| 350 devices — 56 K | $11,000.00 = $ 31.42 | |
| 400 devices — 64K | $14,000.00 = $ 35.00 | |
| 500 devices — 80K | $20,000.00 = $ 40.00 | |

It is the goal of GTS to repay advances within 36 months or sooner if sales are there to support this schedule.

EXHIBIT "B"

AFTER 500, ALL AMOUNTS ARE PAID @ $ 40.00

Agreed by the following principals of each company

BECO Dairy Automation Inc.
- Ray Vasquez (operations director) _____
- Bob Borchert (sales director) _____
- Stan Brown (president) _____
- Brad Losching (executive officer) _____

GTS Global Tech Systems Inc.
- Antonio Fematt (president) _____
- Stan Brown (stockholder) _____
- Bob Borchert (stockholder) _____
- Victor Viesca (stockholder) _____

**EXHIBIT 2**

# GTS-BECO ID System development contract

In order to start the development of the BECO ID systems GTS and BECO agree in next points:

a) The development is scheduled to start April 1 2005.

b) GTS will develop the basic ID system and integrate to the actual NexusPC software. The required modules to develop the basic ID system are:

   1) Drivers to communicate with NEDAP equipment (3 weeks total)
   2) NexusPC software modules (8 weeks total)
   3) Changes in Takeoff software (2 weeks total)
   4) Cow counter system (4 weeks total)
   5) * Gates status detector (2 weeks)
     (Point 5 may not be necessary, we will verify it during development of point 2).
   6) NexusPC software modules for Carrousel barns (4 weeks)

## Total estimated development time: **23 weeks**

c) Points 1 to 5 are explained with more detail in the attached document. They apply mainly for parallel and herringbone parlors. Point 6 has not been analyzed completely, however Carrousel barns are simpler (for the ID process) than parallel or herringbone barns with portal ID's, so it is anticipated that 4 weeks will be enough to develop the software for Carrousel barns. The specifications for Carrousel will be developed in next coming weeks.

d) After the development is done BECO will own all the software/hardware required for the system to work (as specified in the attached document) and won't be any royalty to GTS for its future use.

e) For this development GTS will charge BECO the same salary Rafael A Fematt is getting as BECO employee (which include payroll compensation and house and car allowances). During this development BECO will stop charging GTS for Rafael Fematt salary as it is happening at this moment.

f) Although GTS compensation for this development is Rafael Fematt salary that doesn't mind that Rafael will be working full time in this project (though most of the time it will be). There is another engineer at GTS that will be involved in the development of the system (Jorge Mireles). If for any reason the development is completely halted in GTS because of other activities not related with this project, GTS will inform BECO about it so the compensation from BECO is also halted during that time.

g) GTS will try to finish this development in the specified time, however with this kind of developments delays or changes to the specification may occur, in such a

case GTS will inform to BECO for any change to the original time frame and the reasons of it.

h) BECO will provide all materials and tools required to develop this project. It is anticipated that an industrial PC and an industrial video camera will be required.

i) BECO has the right to cancel this development at any time without any penalty. At the moment the development is canceled BECO will stop paying Rafael A Fematt salary.

j) The development doesn't include any statistic module related to:
 - Get reports of pulsator problems per cow number
 - Get reports of milking statistics per cow number
 - Get reports of milk meter statistics per cow number

GTS will develop last modules by itself and charge BECO as an optional ID module in the same fashion the PulsNexus and ScanNexus modules are charged (per stall basis). The price for last modules will be evaluated later.

k) BECO and GTS will have formal meetings at least once a month to evaluate the schedule of the development.

l) GTS will support the product until it is completely finished. Most of the times after a software product is developed several "software bugs" (software problems) are discovered after the product was completely developed. Solving those problems is not a full time task; most of them can be solved in a few hours. It is expected that around 6 months of "clearing" will be needed in this project after it is finished (after the planned 23 weeks). GTS will clear those problems without any charge to BECO. However it is important to "differentiate" between bugs and new features. Any new feature to the system will incur in charges to BECO.

m) This contract can be amended to include any new situation in the project development, like changes in the project estimated time (increase or decrease), features added or decreased to the project, etc. In order to amend this contract GTS and BECO will get together to discuss such a changes.


Global Tech Systems

Rafael A Fematt

Date: 1/04/05


BECO Dairy Automation

Ray Vasquez

Date: 1 Apr 2005

# GTS-BECO cow ID System

In this document I will explain the requirements needed to add the feature of cow ID to actual GTS system.

After some discussion about several possible configurations the components that will take part in the system are:

- NEDAP radio frequency (RF) cow ID tags. ( www.nedap-agri.com/ )
- Dairy Comp, Herd management software (www.vas.com )
- GTS NexusPc software
- GTS Milk meters and take offs

Figure 1 shows the interaction of last components in the system.

This report will cover next:

- ID system for parallel or herringbone parlors using 2 portals (one per pit side).

The development of ID per milking point (stall) is not covered by this report although in general it is a simplification of last options. Also to implement the system in a carrousel barn will require some software and hardware adaptations.

The modules (hardware and software) that need to be developed are next:

1) Software driver to communicate with NEDAP ID system – 3 weeks
2) NexusPC Software modules – 8 weeks
3) Changes in Take off software – 2 weeks
4) Cow counter system – 4 weeks (time may change significantly, more or less)
5) Gates status detector electronic board (possible) - 2 weeks

## 1) Software drivers to communicate with NEDAP ID system (3weeks total)

a) *Driver to capture ID's from portal (2 weeks)*
NEDAP system has an external intelligent board, which is the one that "capture" the ID going through a portal gate. Software needs to be developed to communicate with that NEDAP board. The communication is made through a RS485 connection (serial port). In order to do that we need to get very familiar with NEDAP communication protocol, at this moment NEDAP already supplied with all the hardware, software and documents needed to start testing such a connection. NEDAP at this moment is very cooperative to share detailed information about how their system works.

b) *Driver to program sorting gates (1 week)*
The same NEDAP system to identify cows is used also to sort cows, we need to get familiar and write some software to let NEDAP system know which cows need to be sorted. Dairy Comp and the milkers are the ones who determine which cows

need to be sorted, Dairy comp passes that information (cows to be sorted) through files (explanation in point 2), and the milkers request to sort a cows through the Take off (explanation in point 3).

### 2) NexusPC Software modules (8 weeks total)

a) *Algorithm to match ID with stall number (3 weeks):*

This is the main part of the system, basically this algorithm receives information about cows that are being identified in real time by the NEDAP system and then this algorithm will try to match them with a stall. This task at first time looks like not really complicated, but it has a lot of small details. The main problem arrives when a cows has no ID tag, then this tasks starts to get complicated. Also there are situation when all the pit side is not completely filled with cows (end of a string), they may skip a stall (bull or cow with problems), etc, etc. The way the algorithm will match the cows is through the order they got into the pit and the stalls that start working, however as I said there are several situations that the software must deal with. At this moment the main obstacle is to deal with cows that have no ID, and we are planning to use a cow counter to solve this problem (check point 4). Also at this moment it seems that all other situations may be "corrected" just by analyzing the takeoffs status and cows that where detected by the NEDAP system, but it is possible that some sensors to detect when the gates to get cows in and out of the pit side might be developed (check point 5).

b) *Modules to read/write information from/to Dairy comp sharing files (3 weeks):*

The NexusPC software at this moment won't do any herd management tasks (like saving records per cow, etc), all that work is going to be done by Dairy Comp software (which is one of the most used systems in USA). However some "communication" between both programs must be done. Next is the information that must be passed between Dairy Comp and NexusPC:

Given a RF ID Tag NexusPC requires from Dairy Comp:

- Cow number
- Expected weight
- Exceptions for that cow (don't milk, sort, etc)

Dairy Comp requires from Nexus PC in a daily basis:
Milking information for every milking that includes:

- RF ID Tag
- Cow number
- Average conductivity
- Flow rates for 15, 30 and 60 secs
- Conductivity for every 60 secs
- Flag if the cow was sorted (check point 3)

The information will be shared between both systems by files. Some small configuration must be done in NexusPC software to know where to find Dairy

comp files. Talks with Dairy Comp people already started and they agreed to interface with our system (they already did it for most of the other milking companies).

c) *Changes to show ID in software views (1 weeks)*
The actual NexusPC user interface is pretty graphical, if the cows are identified, then that information must be shown in the system windows. Some programming must be done to show the cow ID in several windows like the pit view, historic information, etc.

d) *Take off new messages (1 week):*
There are going to be new messages that will be sent between the PC and the take off devices, programming to handle those new messages must be done in the PC and in the Take off (check point 3). Basically the new messages from the Takeoff to the PC are:

- Flow rate and conductivity
- Request to sort a cow from the milker

The new messages from the PC to the Takeoff are:
- Cow number to display
- Exceptions messages from Dairy comp to the milker

## 3) Changes in Take off software (2 weeks total)

As explained in point 2.d some changes needs to be done in the Takeoff software in order to handle better the ID system. The main change is to program some "screens" in the take off so the cow ID can be shown in the Takeoff screen while the cow is milked. Also Dairy comp can send some "messages" to the milkers to give some instructions (like not milk the cow because is in treatment, sort the cow, etc).

In order to allow the milkers to sort a cow we decided that a known sequence in the auto/manual button will trigger that message, something like if the milker touches 3 times the auto/manual button, the Take off asks if he wants to sort that cow and if the milker replies touching the same button 3 times again, then the Take off sends a message to the computer so the computer sends a message to the NEDAP system to look for that cow and get sorted. Some small configuration must be programmed in the takeoff to activate all last options.

More information about the flow rate and conductivity will be sent after the milking was finished. At this moment just the weight and average conductivity is being sent, but also the flow rates for the 30,60 and 120 secs and the conductivity every 60 secs is information that can be used by Dairy comp.

Finally the expected milk weight may be sent from the PC to the take off (calculated by Dairy Comp), so it can be shown in some views in the Take off screen, we are not sure at this moment if that is going to be developed or not.

Next are the required additions to the Take off software:

- Show cow ID in display (several views)

- Show expected milk weight in display (possible)
- Show exception messages
- Sort request protocol
- Send flow rate and conductivity new information to PC

## 4) Cow counter system (4 weeks total)

One of the main, if not the main problem with cow ID systems is handling cows that have no ID tag. For the system is kind of easy to find out that one (or more) cows have no tag at all, because the system can't match the number of cows that were identified by the ID subsystem and the number of stalls that are milking, for example, lets say that 8 cows were detected by the ID system, but 9 cows are being milked according to the Take off information, that tells the system that one cow is being milked with out a tag. The actual systems (from other companies) let the milkers know about the situation and they must locate where that cow is and inform the system about the stall where a cow with out tag was located. Doing that job in a small barn, lets say 10 or less stalls per side is something feasible, but locating a cow in 30 stalls is a daunting task. Actual dairies can easily have herds of 3000 or more cows, having cows without ID tags are a daily problem (tags falling off, tags not working, new cows, etc).

One alternative solution to this problem is to have an ID tag reader by milking point (stall) instead of the portal reader at the entrance of the pit (2 ID readers total), however this approach is expensive and creates other kind of problems (identifying cows that belong to the next stall, not possible to implement in some barns because of construction limitations, etc). Other (drastic) solution is just to discard all the milk weights when one cow can be identified, but that may reduce significantly the percentage of identification in the whole herd. Boumatic and some other companies have implemented a software correction where they try to match the actual weight with the expected weight of the cows that were identified, so in that case just the cow without tag is the only one who won't have a weight assigned, this approach is not 100% accurate but increases the rate of identification.

The whole problem of a missing tag in a cow for a portal system won't exist if beside of detecting an RF ID tag also could be detected that a cow (with or without RF ID tag) has passed through the portal, and then it will be pretty easy to know where the cows without tag are located in the pit. The function of a Cow counter device is just to count or detect when a cow is getting through the portal regardless if the cow has a ID tag or not, so that cow counter device will let the main computer know when a cow is getting through the portal, on the other hand NEDAP system will let the main computer when a cow with ID tag is getting through, so it is going to be pretty easy to know when a cow without ID tag is getting through.

There are several sensors that could be used to detect cow presence, but after some discussions we decided that using a video camera to do the job could be the best approach (if it works right of course). Fortunately at this moment there are already a lot of development made for "object recognition", I already started talking with a couple of companies that have such a systems. One company already told me that the application we are pretending is very feasible to develop.

The idea for this system is not to develop any hardware or software because it may be a too long project, but to find systems already developed for other industries

where we just have to do reconfiguration to them. In one more week I will have most of the information about cost and time for this project, but I anticipate around a month for time and $2500 of money needed to buy equipment (video camera and software for image recognition), I will let you know immediately if any of last figures change considerably about what I am planning.

Finally is important to consider that if this idea works this is a solution that can be patented (an sold later to other companies), however we must discuss before hand who is going to own the rights for this solution if BECO is going to sponsor this development.

On the other hand if this solution doesn't work (with video sensor or any other sensor), then some alternatives must be developed so the milkers have a way to correct by hand when a cow is not detected, this situation must be analyzed very carefully.


## 5) Gates status detector electronic board (2 weeks total)

This is a small board (around a 1.5"x1.5") that basically detects the status of any gate (open or closed), this board may be used to detect when the entrance gate for the pit side is open (letting cows to get in) or closed and also when the exit gate for the pit is open (letting cows to get out) or closed.

At this moment it seems that just checking the state of Takeoffs and cows that were identified it may be possible to know when new cows are getting into the pit, however there are a lot of situation that may create conflicts in knowing where the cows are located, for example if lets say just 3 cows are being milked right now because was the end of a string of cows, then you see that 3 more cows are getting into the pit, the again you see the first 3 cows are reattached, it is hard to know if they reattached the first 3 cows or they are milking the new cows. All this conflicts can be avoided if you know that they opened the exit gate (letting the first 3 cows to go away).

As I said we are still not sure if this small device will be developed or not.



Figure 1